IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-55

No. 274A21

Filed 6 May 2022

IN THE MATTER OF: S.D.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 3 May 2021 by Judge Clifton H. Smith in District Court, Catawba County. This matter was calendared in the Supreme Court on March 18, 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Marcus P. Almond for petitioner-appellee Catawba County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad litem.*

*Garron T. Michael for respondent-appellant mother.*

BERGER, Justice.

¶ 1        Respondent-mother appeals from an order terminating her parental rights to S.D.C. (Scott),[1] born in September 2012.

## I.        Background

¶ 2        Scott was born in September 2012.  In December 2012, Mecklenburg County Department of Social Services obtained nonsecure custody of Scott and filed a petition

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

alleging Scott to be an abused and neglected juvenile. On March 27, 2013, Scott was adjudicated an abused and neglected juvenile based upon findings that he had suffered nonaccidental trauma while in the care of his father, including multiple rib fractures and brain injuries.[2] Scott remained in foster care from December 2012 until June 2014, when the court returned legal and physical custody to respondent.

On May 30, 2019, Catawba County Department of Social Services (DSS) filed a petition alleging Scott was a neglected and dependent juvenile.[3] The petition alleged that on February 9, 2018, respondent shot herself in the foot while preparing to go to a shooting range with Scott present in the home, sleeping in another room. Respondent took Scott with her to the emergency room, where tests confirmed that she had been consuming alcohol. Further, on October 27, 2018, respondent was involved in an automobile accident after drinking two small bottles of vodka. Scott was a passenger in the vehicle at the time of the accident. Both respondent and Scott suffered injuries. After discharge from the hospital, respondent went to reside with the maternal grandparents and participated in substance abuse treatment.

DSS further alleged that on March 28, 2019, respondent was under the influence of alcohol while caring for Scott. An altercation occurred after respondent

---

[2] The father relinquished his parental rights to Scott on October 2, 2020, and is not a party to this appeal.

[3] Jurisdiction over Scott and venue were transferred from Mecklenburg to Catawba County by orders entered in Mecklenburg County on August 2, 2019 and in Catawba County on August 5, 2019.

was confronted by the maternal grandparents about her alcohol abuse. Respondent attempted to remove Scott from their home, and she was subsequently arrested.

¶ 5 The trial court adjudicated Scott a neglected and dependent juvenile on September 19, 2019. The trial court awarded custody of Scott to DSS and approved placement with the maternal grandparents. The trial court identified a host of requirements for respondent to complete to achieve reunification. On November 27, 2019, the trial court found that, although respondent had been granted weekly supervised visitation with Scott for two hours, she missed three visits. Further, while respondent and Scott appeared to share a connection, additional observation was needed to better assess their bond. The trial court set the primary permanent plan as reunification, with a secondary plan of adoption. The trial court also established a visitation schedule that included supervised and unsupervised visits for the next three months.

¶ 6 After a subsequent permanency planning hearing held on January 22, 2020, the trial court entered another order on February 18, 2020. The trial court found that over a span of three months, respondent missed more than five visits, and she only rescheduled two. The trial court found that because respondent was observed as being "frustrated" during visits, continued observation was needed, and "healthier and more positive interactions" were necessary.

¶ 7 On September 16, 2020, the trial court entered an order finding that respondent had incurred two new alcohol-related criminal charges. She was also arrested on March 10, 2020, for public intoxication, March 11, 2020, for misuse of emergency communication systems, and on July 28, 2020, for obtaining property by false pretenses. The trial court changed the primary permanent plan to adoption, with a secondary plan of reunification.

¶ 8 DSS filed a motion to terminate respondent's parental rights to Scott on the grounds of neglect, willfully leaving Scott in foster care or placement outside the home for more than twelve months without making reasonable progress to correct the conditions that led to his removal, and willfully failing to pay a reasonable portion of the cost of care for Scott although physically and financially able to do so. On May 3, 2021, the trial court terminated respondent's parental rights to Scott. The court adjudicated that grounds to terminate respondent's parental rights existed under N.C.G.S. § 7B-1111(a)(1) and (2) and concluded that termination of respondent's parental rights was in Scott's best interests.

¶ 9 In the order, the trial court made the following findings of fact:

1. [Scott] is 8 years old.

2. It is almost certain that [Scott] would be adopted by his maternal grandmother and grandfather once he is legally clear. They are his current placement providers and would like to adopt him once he is legally clear for adoption.

3. Termination of Parental Rights will legally clear the child for adoption and will enable [DSS] to engage in the adoption process for [Scott]. Adoption is the primary permanent plan for the minor child.

4. It is clear that [Scott] loves [respondent], but the two struggle to bond. Due to [respondent's] prolonged absences, [Scott] does not see her as a parental figure and feels as if he can make the decisions and be the "boss" of [respondent]. He does not listen to her well and continues to test to see how far or how long he can do something before she tells him "no."

5. [Scott] and his maternal grandparents have a strong bond. [Scott] feels safe and comfortable in the home with his grandparents and respects and honors them as his parents.

6. If [respondent] works on becoming substance-free, she will have no greater cheerleaders than the maternal grandparents, . . . who will be more than happy to allow her to be around her son if she is safe and sober. Hopefully the day is coming when she will leave her current damaging lifestyle behind. In the meantime, the minor child is in need of a safe permanent home and his grandparents are willing to provide that for him.

Respondent appeals. On appeal, respondent challenges some of the trial court's dispositional findings as not being supported by competent evidence and contends that the trial court abused its discretion in determining that it was in Scott's best interests that her parental rights be terminated.

## II.    Analysis

In a termination proceeding, when a trial court "determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional

stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (first citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); and then citing N.C.G.S. § 7B-1110). "The trial court's dispositional findings of fact are binding on appeal if supported by the evidence received during the termination hearing or not specifically challenged on appeal." *In re K.N.L.P.*, 2022-NCSC-39, ¶ 11. A trial court's best interests determination "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6, 832 S.E.2d 698, 700 (2019). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (cleaned up).

¶ 12    Respondent first challenges the portion of finding of fact 4 which provides that Scott and respondent "struggle to bond." She contends that this portion of the finding is directly refuted by the trial court's oral statements made during the dispositional hearing and is not supported by the evidence.

¶ 13    Pursuant to Rule 58 of the North Carolina Rules of Civil Procedure, "a judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court[.]" N.C.G.S. § 1A-1, Rule 58 (2021). This Court has held that "a trial court's oral findings are subject to change before the final written order is entered." *In re A.U.D.*, 373 N.C. at 9–10, 832 S.E.2d at 702. Therefore, respondent

is unable to demonstrate error based merely on the fact that there were differences between the trial court's orally rendered findings of fact at the dispositional hearing and those set forth in the written order. *See, e.g.*, *In re A.U.D.*, 373 N.C. at 9–10, 832 S.E.2d at 702.

¶ 14        Moreover, finding of fact 4 is supported by the testimony of DSS social workers Kaitlyn Stutts and Kali Jacomine. Ms. Stutts testified that during visitations, Scott was "resistant and . . . trying to test" respondent. Ms. Jacomine further testified that respondent struggled to keep Scott's attention during visits, and Scott would "beg[i]n lashing out and really testing the limits with her." In contrast, when Ms. Jacomine visited with the maternal grandparents alone, she described Scott as "constantly wanting to come in there and see and sit with his grandparents and talk to them and engage with them." Thus, there is evidence in the record that supports the trial court's finding.

¶ 15        Respondent also challenges the portion of finding of fact 4 referencing her "prolonged absences." She argues that this finding is contrary to Ms. Jacomine's testimony and that the "only cause for gaps in her contact with Scott were the direct result of the limited supervised visitation schedule." While it is true that Ms. Jacomine testified that respondent only missed one visit with Scott, respondent overlooks the DSS court report which was admitted into evidence at the termination

of parental rights dispositional hearing. This report highlights multiple gaps in her

contact with Scott:

> Between the initial court hearing on 8/19/2019, and the
> court hearing on 10/28/2019, [respondent] had missed
> three of her supervised visits due to either issues with her
> car or illness. Between the court date on 10/28/2019 and
> 1/22/2020, [respondent] missed a total of six visits.
> [Respondent] stated those visits were missed either due to
> car issues, injuries from a fall at work, miscommunication
> due to the holidays, or illness. From 1/22/20 through
> 3/30/20, [respondent] missed 9 out of 21 possible visits.
> [Respondent] did not show up for the visit on 1/23/20, so no
> visits were held from 1/26/20 [through] 2/1/20.
> [Respondent] did not show up for the visit on 2/23/20 or
> 2/27/20, so no visits were held from 3/1[/2020 through
> 3/]7/2020. [Respondent] did not confirm her visit on 3/6/20,
> so no visits were held from 3/8[/2020 through 3/]14/2020.

¶ 16        The trial court could reasonably infer from this evidence that respondent's

"prolonged absences" resulted in Scott not viewing her "as a parental figure." *See In*

*re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68 (stating that it is the trial court's

duty to consider all the evidence, pass upon the credibility of the witnesses, and

determine the reasonable inferences to be drawn therefrom).

¶ 17        In addition, respondent contests the portion of finding of fact 6 regarding the

maternal grandparents' intentions of allowing respondent to be a part of Scott's life

after her parental rights are terminated. The trial court found that the maternal

grandparents "will be more than happy to allow [respondent] to be around [Scott] if

she is safe and sober." While this appears to be an aspirational statement to

encourage respondent, we agree with her that there is no evidence of record to support this challenged portion of finding of fact 6, and thus, we disregard it. *See, e.g., In re S.M.*, 375 N.C. 673, 691, 850 S.E.2d 292, 306 (2020) (disregarding a finding of fact based on a guardian ad litem report not included in the record on appeal).

¶ 18        Next, respondent argues the trial court abused its discretion by concluding that it was in Scott's best interests to terminate her parental rights.  Specifically, respondent argues that the trial court disregarded the alternative of guardianship and that the trial court's oral statements praising respondent's case plan efforts cut against the necessity of terminating her parental rights.

¶ 19        In determining whether termination of parental rights is in the best interests of a juvenile, a court shall consider

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2021).  This Court has previously observed that

> [t]he purpose of termination of parental rights proceedings is to address circumstances where parental care fails to "promote the healthy and orderly physical and emotional well-being of the juvenile," while also recognizing "the necessity for any juvenile to have a permanent plan of care at the earliest possible age." N.C.G.S. § 7B-1100. In North Carolina, the best interests of the child are the paramount consideration in termination of parental rights cases. *See In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984). Thus, when there is a conflict between the interests of the child and the parents, courts should consider actions that are within the child's best interests over those of the parents. N.C.G.S. § 7B-1100(3).

*In re F.S.T.Y.*, 374 N.C. 532, 540, 843 S.E.2d 160, 165–66 (2020).

¶ 20 The trial court is not precluded from determining that termination of respondent's parental rights is in Scott's best interests merely because it made statements during the dispositional hearing acknowledging respondent's efforts at reunification. *In re A.U.D.*, 373 N.C. at 9–10, 832 S.E.2d at 702 (stating that "[a] trial court's oral findings are subject to change before the final written order is entered"). Furthermore, N.C.G.S. § 7B-1110(a) "does not require the trial court to make written findings regarding any dispositional alternatives it considered." *In re M.S.E.*, 378 N.C. 40, 2021-NCSC-76 ¶ 51. Here, the trial court's findings demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. 88, 101, 839 S.E.2d 792, 801 (2020). Thus, the trial court did not abuse its discretion when it determined that termination of respondent's parental rights was in Scott's best

interests.

### III.    Conclusion

The trial court did not err in terminating respondent's parental rights.  The trial court's findings of fact were supported by the evidence presented to the trial court at the dispositional hearing.  In addition, the trial court was not bound by its oral statements made regarding Scott's best interests, and the written findings support the trial court's conclusion that termination of respondent's parental rights was in Scott's best interests.  As such, we affirm the trial court's order terminating parental rights.

AFFIRMED.